UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COTY A. SLOTHOUR : | |
|     Plaintiff, : | |
| : | Case No. |
| vs. : | |
| : | |
| UNITED CEREBRAL PALSY : | |
| OF CENTRAL PA, : | |
|     Defendant. : | |

## COMPLAINT

AND NOW, this 18th day of May, 2017, comes the Plaintiff, Coty A. Slothour, by and through his counsel, and files this Complaint based on Defendant's Title VII violations by discrimination on the basis of sex and retaliation for participation in a protected activity.

## I. Parties

1. Plaintiff, Coty A. Slothour (hereinafter "Mr. Slothour"), is an adult individual living in Adams County, Pennsylvania. Mr. Slothour is represented by Austin Law Firm LLC, 226 East Market Street, York PA 17403.

2. Defendant, United Cerebral Palsy of Central PA (hereinafter the "Employer" or "UCP of Central PA"), is a Pennsylvania non-profit corporation with its main operational office located at 55 Utley Drive, Camp Hill, PA 17011.

1

## II. Jurisdiction and Venue

3. Jurisdiction is proper over the Employer because it employed Mr. Slothour in the Middle District of Pennsylvania (and both parties are located in the Middle District).

4. Venue is proper in the Middle District of Pennsylvania because the employment was in the Middle District, the cause(s) of action arose in the Middle District, and both parties are located in the Middle District.

5. Title VII, at 42 USC 2000e-5(f)(3), provides that District Courts have exclusive jurisdiction over actions brought under this statute.

## III. Factual Allegations

6. In August 2013, Mr. Slothour began employment with the Employer as an intern/program aide at its adult day program, Branch Creek Neighbors.

7. After completion of the internship, in or about December 2013, Mr. Slothour was offered a full-time program aide position (which he accepted).

8. In February 2014, an internal investigation conducted by the Employer resulted in all Branch Creek Neighbor staff being put on probation for allegedly violating consumer rights.

9. In March 2014, the program supervisor position became open; Mr. Slothour offered to fill that position until a permanent replacement was hired.

10. Mr. Slothour acted as the program supervisor from March through June 2014, during which time he had little to no support from management.

11. Mr. Slothour asked to be considered as the permanent program supervisor and was rejected (supposedly due to a lack of current qualification for the position).

12. Mr. Slothour then assisted the Assistant Director of Adult Services (hereinafter the "Assistant Director") with interviews for the open position and provided his input on the candidates when asked.

13. A new program supervisor was hired in June 2014 and Mr. Slothour continued as a program aide.

14. In June 2014, the new program supervisor and the Assistant Director requested that staff review updated policies and sign off on training. Mr. Slothour asked some questions, after which the Assistant Director's demeanor toward Mr. Slothour changed for the worse.

15. June and July 2014 brought to Mr. Slothour complaints by other employees about the new program supervisor, including on several occasions Mr. Slothour's program instructor questioning if Mr. Slothour could smell alcohol on the program supervisor's breath or if his beverage had alcohol in it.

16. Mr. Slothour could not confirm the program supervisor's alcohol abuse.

17. On 7/14/14, a co-worker told Mr. Slothour that the program supervisor was inappropriately texting the employee's spouse (another employee and hereafter the "complaining employee").

18. Mr. Slothour suggested the co-worker contact the program instructor or Assistant Director.

19. That same day, Mr. Slothour was asked by the complaining employee for an escort back to the building due to being uncomfortable being alone with the program supervisor as a result of the inappropriate text messages and the program manager trying to kiss the complaining employee.

20. Mr. Slothour did escort the complaining employee back into the building and suggested the complaining employee report the program supervisor's conduct to the program instructor or Assistant Director.

21. The complaining employee later requested that Mr. Slothour not report the incident and that it would be worked out with the spouse and program supervisor.

22. The next day, 7/15/14, following the Employer's policy, Mr. Slothour reported to the program instructor what had happened 7/14/14.

23. A safety committee meeting regarding sexual harassment training was held 7/17/14; Mr. Slothour attended and, after the meeting, approached an HR representative, confirmed the Employer's policy of reporting sexual harassment, and again relayed what had happened 7/14/14.

24. Mr. Slothour was told to contact the HR Director.

25. At or about the same time, the complaining employee told Mr. Slothour of overhearing the program supervisor and Assistant Director discussing Mr. Slothour's allegedly inappropriate behavior at work and the program instructor told Mr. Slothour that the sexual harassment allegation had been relayed to the program supervisor and that the program supervisor would speak with Mr. Slothour about the allegation.

26. On 7/24/14, the Assistant Director requested a meeting with Mr. Slothour and included the program supervisor. Mr. Slothour requested that the program supervisor be excluded, believing the meeting to be about the sexual harassment allegation against the program supervisor. The request was denied and the meeting proceed with all three persons.

27. The Assistant Director then began to discuss Mr. Slothour's allegedly inappropriate behavior in June when he asked questions about the training policies.

28. Still believing that the issue of the sexual harassment report should be discussed, Mr. Slothour requested that HR be present; this request too was denied.

29. Mr. Slothour then explained the events of 7/14/14 again, after which the program director jumped up and vehemently denied the allegation.

30. The Assistant Director then asked for more details and promised to look into the allegations.

31. Mr. Slothour spoke to the HR Director on 7/25/14 about the meeting the prior day, including the refusal to have HR present. The HR Director represented an unawareness of the sexual harassment report, so Mr. Slothour again told the events of 7/14/14 (sexual harassment and smelling of alcohol).

32. The Employer asked Mr. Slothour to meet with the HR Director on 7/31/14 to answer questions about the allegations.

33. During the 7/31/14 meeting, the HR Director and Assistant Director told Mr. Slothour that an investigation showed he had made a false report. Mr. Slothour showed the HR Director text messages from the complaining employee to the HR Director, to no avail.

34. The HR Director and Assistant Director then asked Mr. Slothour to sign a termination letter, which he refused to do.

35. After he was discharged, Mr. Slothour filed for unemployment compensation (hereafter "UC") benefits.

36. Within the UC process, the Employer alleged that the discharge was due to Mr. Slothour being insubordinate, but it did not provide sufficient information to the UC Service Center to support its allegation (such that Mr. Slothour was found eligible for UC benefits).

37. Subsequent to the discharge, Mr. Slothour applied for employment elsewhere and was notified pre-interview that the Assistant Director had sent a memo to consumers, parents, guardians, residential staff, and every agency in the immediate area to advise of Mr. Slothour's termination.

38. Mr. Slothour believes, and therefore avers, that the Assistant Director's action was retaliatory and intended to harm Mr. Slothour's reputation and interfere with his future employment opportunities.

39. In November 2014 Mr. Slothour became employed with another entity. As part of that employment, he was required to enter onto the Employer's premises to render services to the new employer's consumers.

40. The Assistant Director contacted the new employer's executive director and notified her that Mr. Slothour was barred from the Employer's

premises, thus again retaliating against Mr. Slothour and impeding his employment prospects and ability to perform other employment.

41. As an aside, it is interesting to note that shortly after the Employer discharged Mr. Slothour, it also terminated the program supervisor for being intoxicated while at work.

42. On 6/5/15, Mr. Slothour filed a charge with the EEOC.

43. By Letter of Determination dated 9/30/16, the EEOC found "reason to believe that violations have occurred" and attempted conciliation with the Employer.

44. The EEOC issued a Notice of Conciliation Failure dated 2/21/17.

45. The EEOC also sent to Mr. Slothour a Notice of Right to Sue, also dated 2/21/17.

## **IV. Claim**

46. Mr. Slothour incorporates by reference the factual allegations in Paragraphs 6-45 above as if set forth at length herein.

47. The Employer violated 42 USC 2000e-2(a)(1) by discharging Mr. Slothour for making a report of alleged sexual harassment.

48. The Employer also violated 42 USC 2000e-2(m) by using sex as a (or in this case, the) motivating factor for his discharge.

49. The Employer is also in violation of 42 USC 2000e-3(a) for discharging Mr. Slothour for reporting alleged sexual harassment.

50. Mr. Slothour experienced a loss of income subsequent to the discharge from employment with the Employer, which loss is a direct result of the discharge in violation of Title VII.

51. 42 USC 2000e-5 provides for relief to Mr. Slothour including but not limited to back pay, front pay, and other equitable relief as appropriate.

WHEREFORE, Mr. Slothour respectfully requests that this Court enter judgment in his favor and against the Defendant, UCP of Central PA, require that the Defendant (a) pay to Mr. Slothour the difference between what he was making at UCP of Central PA and his earnings since then, same from the date of discharge through the date of judgment, with interest, (b) reimburse Mr. Slothour for the attorneys' fees and costs incurred by him relative to this suit, (c) pay to Mr. Slothour the cost of lost health insurance premiums due to employment termination, (d) pay to Mr. Slothour, with interest, the amounts the Defendant would have contributed to a 403(b) on behalf of Mr. Slothour, (e) pay to Mr. Slothour the appropriate amount on account of his emotional distress including increased anxiety, humiliation, and harm to personal and business reputations, and

and (f) offer equitable relief including (i) clearing from Mr. Slothour's files/records anything having to do with employment termination other than on good terms, (ii) permitting Mr. Slothour to perform services for or in conjunction with other agencies on Defendant's premises, (iii) providing to Mr. Slothour a positive letter of reference, dated and signed by the CEO or similar executive authorized by Defendant's Board to execute same on behalf of the Defendant, (iv) agreeing not to disparage Mr. Slothour in any way or by any method, (v) arranging for employees in the location where Mr. Slothour was employed to undergo sensitivity training, including but not limited to how to investigate complaints and what actions are legal or illegal to take as a result of a complaint, (vi) sending a letter, dated and signed by Defendant's CEO as authorized by the Board, to all employers (including The Cornerstone Agency of Pennsylvania), consumers, organizations, facilities and faculty (including Professor Dr. Marita Flagler of Shippensburg University's social work department) who were sent something in writing by the Defendant or with whom the Defendant corresponded about Mr. Slothour, advising that Mr. Slothour did nothing wrong when in the Defendant's employ, (vii) reimbursing Mr. Slothour for all insurance premiums paid or to have been paid by Mr. Slothour between the date of discharge and the date upon which he became eligible for coverage paid by

any new/subsequent employer, and (viii) not retaliating against Mr. Slothour's family, and for such other relief as may be just and proper.

        Respectfully submitted,

        AUSTIN LAW FIRM LLC


    By: /s/ *Sara A. Austin* _____
        Sara A. Austin, Esquire
        Supreme Court I.D. No. 59052
        226 East Market Street
        York, PA  17403
        (717) 846-2246
        Counsel for Plaintiff

## **VERIFICATION**

The undersigned hereby affirms that the facts contained in the foregoing document are true and correct to the best of his knowledge, information and belief. This statement is made subject to the penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities.

DATE: 5/17/17                              /s/ *Coty A. Slothour*_____
                                           Coty A. Slothour